UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

<u>In re</u>

COLONY BEACH & TENNIS CLUB
ASSOCIATION, INC.,

_____/

COLONY BEACH & TENNIS CLUB, INC.,
and COLONY BEACH, INC.,

     Appellants,

v.                                                                    CASE NO.:  8:10-cv-913-T-23

COLONY BEACH & TENNIS CLUB
ASSOCIATION, INC.,

     Appellee.
_____/

## **ORDER**

The appellants Colony Beach & Tennis Club, Inc., and Colony Beach, Inc., appeal

(Doc. 1-1) under 28 U.S.C. § 158(a)(1) from the bankruptcy court's January 15, 2010,

judgment and order (Docs. 1-2, 1-3), which (1) declare a ninety-nine-year recreational

facilities lease unconscionable under Section 718.122, Florida Statutes, and common

law; (2) sustain the appellee's objection to claims sixteen, nineteen, twenty, and twenty-

one; and (3) disallow the appellants' claims.  The issues on appeal are (1) whether the

dispute over the lease qualifies as a "core proceeding" under 28 U.S.C. § 157,

(2) whether the bankruptcy court correctly declared the lease unconscionable, and

(3) whether the bankruptcy court correctly held that the appellee neither released nor waived nor otherwise forfeited the defense of unconscionability.

Discussion

*1. Introduction*

In 1973, Dr. Murray Klauber founded the Colony Beach & Tennis Club (the "Colony"), a Gulf Coast resort comprised of a hotel, a condominium, a restaurant, recreational facilities, and other amenities.  Dr. Klauber created for the condominium a novel ownership structure in which a purchaser became an investor in the Colony's limited partnership (the "Partnership") and Dr. Klauber served as the general partner.  Upon purchasing a unit, the investor obtained a limited partnership interest secured by a unit.  The investor obtained also a fee simple interest in the unit but agreed to dedicate the unit to the Partnership's use for all but thirty days of the year.

On November 29, 1973, (before the first sale of a unit) the condominium unit owner's association, the Colony Beach & Tennis Club Association, Inc., (the "Association") entered a ninety-nine-year lease (the "Lease") for use of the Colony's recreational facilities—a pool, tennis courts, a locker room, a meeting room, and a clubhouse.  Dr. Klauber and Joseph Penner were general partners in Colony Beach Associates, Ltd., ("CBA"), the developer of the Colony and the lessor under the lease.[1]  Both Klauber and Penner signed the lease on behalf of the lessor, and Penner signed as president of the Association, the lessee.  The lease requires an initial, annual rent of $153,000.00, which every ten years may increase based on a change in the consumer

---

[1] CBA no longer holds an interest in the lease.  The appellants hold eighty percent of the interest in the lease, and two trusts hold the remaining interest in the lease.

price index (the "CPI").  However, from November, 1973, until October, 2008, with

revenue generated by the hotel the Partnership paid both the annual rent and the other

expenses of the Association.  In practice, for more than thirty-five years the lessor never

charged[2] and the Association never paid rent . . . . . . not a cent.

Several disputes occurred between 1980 and 1994 over the Lease's annual rent

and rent escalation formula.  Each dispute ended in a settlement.  In February, 2008,

the Partnership sued in state court for breach of contract and for a declaration of the

Association's financial obligation under the Lease.  In October, 2008, the Association

petitioned for Chapter 11 relief (Case No. 8:08-bk-16972-KRM).  A month later, the

Association removed the state court action (Case No. 8:08-ap-568-KRM) to bankruptcy

court and asserted that the Lease was unconscionable. The appellants moved for

abstention and remand.  After denying remand and conducting a trial, the bankruptcy

court declared the Lease unconscionable and disallowed claims against the bankruptcy

estate deriving from the Lease.

*2. The Appeal*

a. A Preliminary Issue

Review of this matter is complicated by the bankruptcy judge's adopting nearly

verbatim a proposed order authored by counsel for the Association.[3]  "'The cases

admonishing trial courts for the verbatim adoption of proposed orders drafted by litigants

---

[2] However, the lessor reserved the right to collect rent in accord with the term of the lease, and the rent received an upward adjustment in 1983 to $351,000.00; in 1993 to $510,000.00; and in 2003 to $653,000.00.

[3] See Doc. 12-7 pp. 32-33; Docs. 1-3 and 31.

are legion.'" <u>Chudasama v. Mazda Motor Corp.</u>, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997) (Tjoflat, J.) (quoting <u>Colony Square Co. v. Prudential Ins. Co.</u>, 819 F.2d 272, 274-75 (11th Cir. 1987)); <u>In re TOUSA, Inc.</u>, 444 B.R. 613, 643-45 (S.D. Fla. 2011) (Gold, J.).  Binding precedent in the Eleventh Circuit condemns the practice, which "harms the quality of the . . . deliberative process," impedes appellate review, and "creates 'the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor.'"  123 F.3d at 1373 n.46 (citations omitted).  Typically, proposed orders:

> 'in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can.  When these findings get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case.'

<u>United States v. El Paso Natural Gas Co.</u>, 376 U.S. 651, 656 & n.4 (1964).

Although the signing of a proposed order neither affects the standard of review nor automatically "create[s] an 'appearance of impropriety'" necessitating recusal, <u>Chudasama</u>, 123 F.3d at 1373 n.46, "'the appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered' when factual findings were not the product of personal analysis and determination by the trial judge."  <u>Colony Square</u>, 819 F.2d at 275 n.9.

### b. Whether the Dispute Over the Lease Qualifies as a "Core Proceeding"

A bankruptcy court may "hear and determine . . . all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this

section, and may enter appropriate orders and judgments, subject to review under

section 158 . . . ."  28 U.S.C. § 157(b).  Section 157(b)(2) delineates a non-exclusive list

of "core proceedings."  A bankruptcy judge may hear "a proceeding that is not a core

proceeding but that is otherwise related to a case under title 11."  28 U.S.C. § 157(c).

However, if a bankruptcy judge hears a "non-core proceeding":

> the bankruptcy judge shall submit proposed findings of fact and
> conclusions of law to the district court, and any final order or
> judgment shall be entered by the district judge after considering the
> bankruptcy judge's proposed findings and conclusions and after
> reviewing de novo those matters to which any party has timely and
> specifically objected.

28 U.S.C. § 157(c).

The appellants cite In re Happy Hocker Pawn Shop, Inc., 212 F. App'x 811 (11th

Cir. 2006), and argue that the bankruptcy court erred in classifying as a "core

proceeding" the Association's challenge to the Lease.  In response, the Association

argues that "the holding of Happy Hocker is inapposite to the instant case" because

Happy Hocker involves neither the "allowance or disallowance of claims against the

estate" nor "counterclaims by the estate against persons filing claims against the estate"

(two examples of "core proceedings" identified in Section 157(b)(2)).

The claim in Happy Hocker arose from a bankruptcy trustee's acting outside the

scope of his authority and mistakenly closing a non-debtor business.  The business

sued the trustee in an adversary proceeding in bankruptcy court and obtained a

declaratory judgment against the trustee.  The business next sought leave to sue the

trustee in state court for tortious interference (among other torts).  The bankruptcy court

granted leave because the proposed complaint "sounded in state law and did not arise

under the bankruptcy code." Happy Hocker affirms the decision and cites the test for a

"core proceeding" stated in In re Wood, 825 F.2d 90, 97 (5th Cir. 1987):

> '[i]f the proceeding involves a right created by the federal bankruptcy
> law, it is a core proceeding; for example, an action by the trustee to
> avoid a preference. If the proceeding is one that would arise only in
> bankruptcy, it is also a core proceeding; for example, the filing of a
> proof of claim or an objection to the discharge of a particular debt. If
> the proceeding does not invoke a substantive right created by the
> federal bankruptcy law and is one that could exist outside of
> bankruptcy it is not a core proceeding; it may be related to the
> bankruptcy because of its potential effect, but under section
> 157(c)(1) it is an 'otherwise related' or non-core proceeding.'

See In re Toledo, 170 F.3d 1340, 1348 (11th Cir. 1999) (adopting the test for a "core

proceeding as described in In re Wood).  In reviewing the business's proposed

complaint against the trustee, Happy Hocker holds that the proposed complaint fails to

qualify as a "core proceeding" on the finding (1) that the proposed complaint "could

never qualify as a 'core proceeding' of [the] bankruptcy estate because [the complaint]

alleges tortious actions against property that is not part of the bankruptcy estate";

(2) that the proposed complaint "does not invoke a substantive right created by

bankruptcy law'" and (3) that the proposed complaint "could arise outside of bankruptcy

law."

Similar to Happy Hocker, this action involves neither a substantive right created

by bankruptcy law nor a proceeding that could arise only in bankruptcy.  In fact, this

action involves a claim governed entirely by state law and susceptible to adjudication

entirely "outside of bankruptcy." In re Wood, 825 F.2d at 97; Dale v. Comcast Corp.,

498 F.3d 1216, 1219 n.2 (11th Cir. 2007).  Although the dispute over the lease "may be

related to the bankruptcy because of its potential effect," 825 F.2d at 97, (i.e., the

potential effect on both the allowance or disallowance of claims against the estate and

the counter-claims of the estate), the dispute undoubtedly qualifies as an "otherwise

related" or "non-core proceeding" under Section 157.  Accordingly, the bankruptcy

judge's findings of fact and conclusions of law are construed as proposed findings and

conclusions and receive de novo review.  (In any event, whether construed as a "core"

proceeding—subject to a more lenient standard of review—or a "non-core" proceeding,

the outcome of this appeal is unaffected).

> ### c. Whether the Bankruptcy Court Correctly Declared the Lease Presumptively Unconscionable Under Section 718.122, Florida Statutes

Section 718.122, Florida Statutes, creates a rebuttable presumption of

unconscionability if a lease contains each of nine enumerated elements.  The appellants

concede (Doc. 19) that the Association proved the existence of each element except

Section 718.122(g), which states that:

> The lease requires an annual rental which exceeds [twenty-five] percent of the appraised value of the leased property as improved, provided that, for purposes of this paragraph, 'annual rental' means the amount due during the first [twelve] months of the lease for all units, regardless of whether such units were in fact occupied or sold during that period, and 'appraised value' means the appraised value placed upon the leased property the first tax year after the sale of a unit in the condominium . . . .

The Colony's first condominium unit sold in December, 1973, and the remaining units

sold (for the first time; re-sales occurred throughout the intervening thirty-five years)

sometime after January, 1976.[4]  In accord with Section 718.122(g), the pertinent tax

year for determining the "appraised value of the leased property as improved" is 1974.

---

[4] (Doc. 1-3, p.7)

At the outset of the two-day trial, Dr. Klauber testified that a 1976 prospectus, which identifies an approximate value of $870,000.00, contains an accurate assessment of the value of the leased property as improved in 1976.[5]  The appellants called as an expert witness Dr. Henry Fishkind, who provided a general analysis of the Lease and an analysis of comparable recreational facilities leases.  Dr. Fishkind provided no assessment of the appraised value of the leased property as improved in 1974.[6]  The Association presented an expert witness, Gerald Russell, who appraised the current market value of the leased property.  In his appraisal, Russell assumed that the leased property consisted of vacant, unimproved land.  Russell provided no assessment of the fair market value of the property as improved in 1974.[7]  The Association presented also the testimony of Steven Oscher, who relied on both Russell's appraisal of the current, unimproved value of the leased property and a CPI-adjusted annual rent to determine that the lease requires an annual rent exceeding twenty-five percent of the leased property's appraised value.  However, Oscher acknowledged (1) that Section 718.122(g) requires an assessment of the leased property "as improved" and (2) that, if Oscher compared the "as improved" value of the leased property to the CPI-adjusted annual rent, the percentage became approximately ten percent.[8]

---

[5] May 18, 2009, Transcript of Hearing, Doc. 11-3, pp. 35-38.

[6] May 19, 2009, Transcript of Hearing, Doc. 11-2, pp. 73-74.

[7] May 18, 2009, T.R., pp. 131, 138-39.

[8] May 18, 2009, T.R., pp. 158-60.

Although Dr. Fishkind testified that he conducted no analysis under Section 718.122(g), the bankruptcy judge described[9] Dr. Fishkind as an expert witness "testifying to value" under Section 718.122(g) and rejected Dr. Fishkind's testimony (1) as based on a methodology that "is not an accepted scientific methodology" and (2) as "strictly subjective and . . . an analytical fiction."[10] The bankruptcy judge rejected Russell's testimony also because Russell's appraisal assumed, contrary to Section 718.122(g), that the leased property was both vacant and unimproved. Finding "neither of the[] [experts] particularly helpful,"[11] the bankruptcy judge turned to certain prospectuses presented by both the Association and the appellants.

In particular, the bankruptcy judge reviewed unaudited financial statements contained in prospectuses issued separately by CBA and Colony Beach, Inc., ("CBI"), who each held a fractional interest in the lease. CBA and CBI issued the prospectuses on August 17, 1973; January 23, 1976; and December 17, 1976.[12] No prospectus contains an appraised value of the leased property in 1974, and the record wholly lacks testimony or other proof of the method by which the value was calculated. However, CBI's January 23, 1976, prospectus describes CBI's assets as including recreational facilities worth approximately $468,562.00 in 1975. The January 23, 1976, prospectus

---

[9] August 10, 2009, Transcript of Hearing, Doc. 12-7, pp. 23-24.

[10] The bankruptcy judge rejected Dr. Fishkind's testimony under Rule 702, Federal Rules of Evidence, and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), on the determination that Dr. Fishkind's "equivalent recreational unit" approach was "subjective" and "was not based on objective scientific facts and data . . . []or . . . the product of reliable scientific principles and methods."

[11] (Docs. 1-3); August 10, 2009, T.R. pp. 23-25. The bankruptcy judge neither acknowledged nor explicitly rejected Oscher's testimony, which relied on Russell's appraised value.

[12] (Docs. 6-9, 7-2, 8, 8-1)

states also (1) that CBI holds a thirty-five percent interest in the Lease; (2) that the cost of the recreational facilities to CBA "was approximately $870,000.00, of which about $350,000.00 is the cost of construction of improvements, and the balance is the allocated cost of the land"; and (3) that "[t]otal rent[] [from the lease of the recreational facilities], when all [u]nits are sold, will be $153,000 per year for each then remaining year of the 99 year term, a return of about 17.6% per year over the term of the contract."[13]  The bankruptcy judge notes that "[t]his statement could suggest an initial cost of the [p]roperty of approximately $870,000" but summarily dismisses the evidence because "there is no evidence . . . that the [p]roperty was ever reflected on the books of the developers . . . at $870,000."

Nevertheless, despite the fact (1) that CBA and CBI each held a fractional interest in the Lease and issued separate prospectuses and reports; (2) that no prospectus describes the leased property's value in 1974; (3) that the January, 1976, prospectus anticipates a seventeen-and-a-half percent rate of return on the Lease "when all units are sold"; and (4) that the January, 1976, prospectus unambiguously values the cost of the land and improvements on the leased property at $870,000, the bankruptcy judge determined that the prospectuses "reflect an approximate value of $470,000 for the [leased] [p]roperty"[14] for the purpose of Section 718.122(g).  In other words, in declaring the Lease presumptively unconscionable, the bankruptcy judge ignored without explanation pertinent facts and relied on no evidence reliably and lawfully appraising the

---

[13] (Docs. 7-1, pp. 9-10; 7-2)

[14] (Doc. 1-3)

value of the leased property and improvements in 1974.  The bankruptcy judge erred in concluding that the Lease is presumptively unconscionable under Section 718.122(g).

### d. Whether the Bankruptcy Court Correctly Declared the Lease both Procedurally and Substantively Unconscionable

The bankruptcy court concluded also that the lease satisfies the common law unconscionability standard, which requires both procedural and substantive unconscionability.  Powertel, Inc. v. Bexley, 743 So. 2d 570, 574 (Fla. 1st DCA 1999); Kohl v. Bay Colony Club Condo., Inc., 398 So. 2d 865, 867-68 (Fla. 4th DCA 1981) (describing the "dual requirements" as the "'absence of meaningful choice . . . together with contract terms which are unreasonably favorable to the other party.'").  "If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."   Steinhardt v. Rudolph, 422 So. 2d 884, 889 (Fla. 3d DCA 1982).

"The procedural component of unconscionability relates to the manner in which the contract was entered and it involves consideration of such issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms."  743 So.2d at 574; Kohl, 398 So. 2d at 867-68 (describing procedural unconscionability as "the individualized circumstances surrounding each contracting party at the time the contract was entered into.").  The "absence of meaningful choice" is "determined by analyzing the respective bargaining powers of the contracting parties, and the ability of the particular contracting party, in light of his education, intelligence, or

- 11 -

lack thereof, to understand the terms of the contract." Kohl, 398 So. 2d at 868.  The

substantive component focuses on the terms of the agreement.  398 So. 2d at 868

(describing substantive unconscionability as proof that "the terms of the contract are

unreasonable and unfair."); Powertel, 743 So. 2d at 574.

In this instance, the bankruptcy judge found procedural unconscionability based

on a determination that the Lease constitutes "an act of self-dealing" (1) because "Dr.

Klauber, through CBA, dictated the terms of the lease in 1973 as both the lessor and

the developer in control of the Association" and (2) because "neither the Association[]

nor the individual [u]nit [o]wners had any meaningful choice regarding the terms of the

lease."[15]  However, as the appellants persuasively argue (1) a developer typically acts

on behalf of the association "until the units are sold and the association is turned over to

the unit owners" because, until the units sell, "there is no one else to act for the

[a]ssociation";[16] (2) Section 718.302, Florida Statutes, acknowledges this widespread

development practice and "specifically addresses unit owners' rights regarding contracts

---

[15] (Doc. 1-3)

[16] In fact, as the RESTATEMENT (THIRD) OF PROPERTY: COMMON-INTEREST COMMUNITIES § 6.19
explains:

> When a common-interest community is created, a vehicle for managing the
> common property and servitude regime is generally contemplated because of the
> difficulties of managing common property as tenants in common. The developer is
> best positioned to create the association because of its resources and ability to
> coordinate the declaration, articles of incorporation, and bylaws, and to ensure that
> all lots or units in the community are included. In providing that the developer has
> an implied duty to create an association, this section reflects widespread
> development practice and follows modern common-interest-community statutes.

Section 6.19, cmt. a.

entered prior to association turn-over";[17] and (3) the bankruptcy judge's "implication" that a contract entered by an association before "turn-over" is "per se procedurally unconscionable finds no support in the law" (and, of course, none is cited). Furthermore, Dr. Klauber testified that investors in the Colony consisted mostly of sophisticated, successful individuals, many of whom either practiced law or engaged a lawyer in the purchase of a unit.[18]  The Association presented no evidence (e.g., testimony by a primary investor and unit owner in the Colony) of either deceptive or aggressive sales practices or the investors' lack of education, intelligence, business savvy, or legal counsel.  The evidence shows complete, prominent, and repeated disclosure of the Lease and its terms.  Accordingly, (1) because Dr. Klauber's "dictating the terms of" the lease provides little, if any, evidence of procedural unconscionability (the Florida Statutes assume the arrangements exist so that disclosure is possible) and (2) because the Association presented no evidence that the Colony's primary unit purchasers were anything other than sophisticated, intelligent investors with "a meaningful choice" in deciding whether to invest in the Colony, the bankruptcy judge possessed no evidentiary basis for declaring the Lease procedurally unconscionable.

---

[17] Section 718.302 states that, upon the affirmative vote of a certain percent of unit owners:

> [a]ny grant or reservation made by a declaration, lease, or other document, and any contract made by an association prior to assumption of control of the association by unit owners other than the developer, that provides for operation, maintenance, or management of a condominium association or property serving the unit owners of a condominium shall be fair and reasonable, and such grant, reservation, or contract may be canceled by unit owners other than the developer . . . .

[18] May 18, 2009, T.R. at pp. 92-93.

Nonetheless, even if the record supported a finding of procedural unconscionability, the bankruptcy judge's finding of substantive unconscionability is neither persuasive nor supported by the evidence.  The bankruptcy judge found substantive unconscionability based on (1) the lessor's charging "above-market rent" but bearing "no responsibilities"; (2) the lessor's ability to procure a lien on a unit for a unit owner's failure to pay rent; (3) the lessor's purported immunity from a breach of the Lease;[19] (4) the thirty-day restriction on a unit owner's use of the recreational facilities; and (5) the lease's purported demand for compound rent escalation correlated to the CPI to occur every ten years.  However, the record demonstrates (1) that, although the rent escalation formula appears to require "compounding," the formula is both ambiguous and susceptible to an interpretation that requires no compounding; (2) that, in practice, the lessor never charged compounded rent; (3) that a formula mandating a CPI adjustment every ten years results in an annual rent that lags behind the inflation rate; (4) that a 1994 settlement resolves the dispute over compounding and clarifies the rent escalation formula;[20] (5) that nothing in the record establishes the value of the leased property as "approximately $470,000 in either 1973 and 1974 (the "time of the initial sale of units at [t]he Colony");[21] and (6) that the unit owners never paid rent and enjoyed the use of the recreational facilities for thirty days of each year beginning in December, 1973, and ending in October, 2008.

---

[19] The Lease (Doc. 13-3) states that "No act of commission or omission by the Lessor shall ever be construed or considered: (a) as a breach by the Lessor of any of its promises or covenants in this lease made . . . ."

[20] May 18, 2009, T.R. pp. 147-160.

[21] (Doc. 1-3); see supra part b of this order.

Accordingly, the bankruptcy judge's conclusion that the Lease evinces "overwhelming procedural and substantive unconscionability" suffers from a manifest absence of factual support in the record.

### e. Whether the Bankruptcy Court Correctly Held that the Association Neither Released nor Waived nor Otherwise Forfeited the Defense of Unconscionability

The appellants argue that the bankruptcy court erred in failing—based on res judicata, the statute of limitations, laches, or waiver—to preclude the Association's defense of unconscionability.

As the bankruptcy judge recognized, the legal dispute over the Lease's annual rent and rent escalation formula began in 1980 with an attorney for the Association writing a letter "raising the issue of unconscionability."[22]  In 1981, the Association executed an amendment to the rent escalation formula, which amendment replaces the CPI adjustment with a mechanism based on the fair market value of the leased property.  Unable to resolve competing appraisals and agree to an adjustment to the annual rent, the lessors sued in 1983 and the Association counter-claimed for breach of the Lease.  In 1984, the Association settled with the lessors.  In accord with the settlement, (1) the Partnership agreed to pay the annual rent due under the lease, (2) the Association agreed to the amount that the Partnership was obligated to pay, (3) the Association agreed to rescind the 1981 amendment, and (4) the Association agreed to dismiss the 1983 action with prejudice no later than ten days after an amendment to the partnership agreement.  In 1986, the Association executed a

---

[22] (Doc. 1-3)

settlement and agreed (1) to dismissal with prejudice of the 1983 action; (2) to an

adjusted annual rent beginning January 1, 1983; (3) to ratify and confirm the original

terms of the Lease; (4) to terminate the 1983 amendment; and (5) to a mutual release of

claims.  The 1986 mutual release states the following:

> [E]ach of the parties and all those in privity with them release and
> forever discharge the other and all those in privity with them of and
> from any and all claims, demands, damages, actions, causes of
> action, or suits in equity, of whatever kind or nature, whether
> accruing now or in the future, or whether now known or unknown to
> the parties, for or because of any right, duty or obligation set forth in
> the Amendment to the Recreation Lease, and each of the parties
> agrees that its relationship with the other, with regard to the Colony
> Beach Tennis Club Recreational Facilities and the Recreation Lease,
> shall be governed by the Recreation Lease as originally established
> and as interpreted in the Agreement.  Furthermore, each of the
> parties and all those in privity with them release and forever
> discharge the other and all those in privity with them of and from any
> and all claims, demands, damages, actions, causes of action, and
> suits in equity, of whatever kind or nature, and whether accruing now
> or in the future, or whether known or unknown to the parties, for or
> because of any matter or thing done or omitted, or suffered by either
> of such parties prior to and including the date hereof which is in any
> way directly and indirectly arising out of the litigation.   Notwith-
> standing any other provision of this mutual release, each of the
> parties agrees that nothing within this release is intended to alter the
> relationship and the obligation between the parties as established by
> the Recreation Lease as interpreted in the Agreement.  In addition,
> each of the parties agrees that nothing within this release, or within
> the Agreement, is intended to extinguish the rights and obligations of
> the parties established by the Recreation Lease or for the Recreation
> Lease to be deemed a new agreement, either in whole or in part.[23]

In 1989, William Merrill (the trustee of a trust holding a five percent interest in the

Lease) sued Dr. Klauber and the Association for rent due under the Lease.  The dispute

ended with a joint stipulation and a "re[-]instatement agreement" in which the

---

[23] (Doc. 9-7 pp. 10-11)

Association ratified the Lease and confirmed Merrill's interest under the lease.  In 1994, the parties resolved another dispute over the adjustment to the annual rent.  In the 1994 settlement, the parties agreed to an adjusted annual rent of $510,000.00 beginning on January 1, 1993.  The parties operated under (and received the benefit of) this series of agreements until 2008.[24]

Nonetheless, despite decades of the parties' treating each agreement as binding and the Association's receiving the benefit of each agreement, the bankruptcy judge found that "[e]ach of these disputes resulted in a temporary accommodation of one sort or another, but none of the disputes resulted in either a binding resolution properly agreed to by the Association and all of the Lessors or a duly recorded amendment in the public records of Sarasota County, Florida."  In determining that no dispute "resulted in . . . a binding resolution properly agreed to by the Association and all of the Lessors," the bankruptcy judge relied on the fact (1) that neither Merrill nor Carolyn Field (the trustee of a trust holding a fifteen percent interest in the lease) signed the 1981 amendment; (2) that the Association was administratively dissolved from December, 1980, until January, 1990; (3) that neither Merrill nor Field signed the 1984 settlement agreement; (4) that neither Merrill nor Field signed the 1986 settlement agreement and release; (5) that only Merrill signed the re-instatement agreement; (6) that Merrill's signature was not notarized; and (7) that neither Merrill nor Field signed the 1994 agreement.[25]

---

[24] (Doc. 1-3)

[25] (Doc. 1-3)

First, the bankruptcy judge rejected the appellants' res judicata[26] argument.  The bankruptcy judge found (1) that each written agreement "expressly reserved the parties' rights as to other issues not raised in the litigation"; (2) that unconscionability "has never been litigated in any of the previous lawsuits"; (3) that unconscionability "was not an essential outcome of the lawsuit" in 1983 (even though the Association raised the issue); (4) that "[t]here has never been mutuality of parties because the Association was a dissolved entity and not all of the lessors were parties in the lawsuits"; and (5) that, because the settlement agreements "would not necessarily be binding on the other Lessors" (i.e., Merrill and Field) who failed to sign the agreements, the appellants were not in privity with Merrill and Field.

However, the parties to this action are CBI, Colony Beach and Tennis Club, and the Association, all of whom participated in the 1983 and 1989 actions.  Thus, whether the parties' agreement binds a non-party, i.e., either Merrill or Field, is superfluous to the applicability of res judicata to this action.  The bankruptcy judge fails to adequately

---

[26] Res judicata precludes "a subsequent action between parties to a previous judgment" if the previous judgment and subsequent action share "(1) identity in the thing sued for, (2) identity of the cause of action, (3) identity of the persons and parties to the actions, and (4) identity of the quality or capacity of the person for or against whom the claim is made."  Campbell v. State, 906 So.2d 293, 295 (Fla. 2nd DCA 2004) (citing State St. Bank & Trust Co. v. Badra, 765 So.2d 251, 253 (Fla. 4th DCA 2000)); see Mayo Clinic Jacksonville v. Alzheimer's Institute of America, Inc., 683 F. Supp. 2d 1292, 1298-99 (M.D. Fla. 2009) (finding that "Res judicata operates when the plaintiff shows that an earlier decision '(1) was rendered by a court of competent jurisdiction; (2) was final; (3) involved the same parties or their privies; and (4) involved the same causes of action.'").  Res judicata (1) "applies to matters actually raised and determined in the original proceeding and also to matters which could have properly been raised and determined'" and (2) "'acts as a bar not only to the precise legal theory presented in previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact . . . .'"  United Auto. Ins. Co. v. Law Offices of Michael I. Libman, 46 So. 3d 1101, 1104 (Fla. 3d DCA 2010) (quoting State v. McBride, 848 So. 2d 287, 290 (Fla. 2003)); Mayo Clinic, 683 F. Supp. 2d at 1299.  The parties' intent as expressed in a settlement agreement determines the res judicata effect of a dismissal based on the settlement agreement.  Norfolk Southern Corp. v. Chevron, U.S.A., Inc., 371 F.3d 1285, 1289 (11th Cir. 2004).

explain the Association's failure to raise—in any of the parties' successive disputes over the annual rent—a claim that could have been raised and that constitutes "a claim arising out of the same operative nucleus of fact" as the rent escalation formula. Libman, 46 So. 3d at 1104.

Furthermore, the bankruptcy judge treated unconscionability as a compulsory counter-claim in rejecting the appellants' statute of limitations argument and stated that an "affirmative claim[] that would otherwise be barred by the statute of limitations may still be asserted as a defense."[27]   The bankruptcy court described unconscionability both as a defense and as a claim in the nature of recoupment.[28]   However, as the appellants astutely argue:

> If the Bankruptcy Court is correct in labeling the unconscionability defense "compulsory" for purposes of avoiding the statute of limitations, [unconscionability] was equally "compulsory" in the past lawsuits and was waived by the Association's failure to raise it in the prior lawsuits.  What the Bankruptcy Court did, in effect, is to render the unconscionability defense permissive in the past lawsuits for purposes of claim preclusion, while counter-designating [unconscionability] as compulsory in the instant case for purposes of avoiding the statute of limitations.

The bankruptcy judge fails to adequately explain how he determined both (1) that res judicata presents no bar to the Association's claim of unconscionability, despite decades of litigation between the parties over the Lease, and (2) that unconscionability is a compulsory counterclaim "in recoupment."  The bankruptcy judge also fails to

___

[27] The bankruptcy judge cites Allie v. Ionata, 503 So. 2d 1237, 1240-41 (Fla. 1987) (finding that "'a party otherwise barred from instituting an action because of a time limitation is freed from that bar when he acts in a defensive posture.'") and In re Smith, 737 F.2d 1549, 1554 (11th Cir. 1984) (finding that "the statute of limitation aimed at precluding stale litigation will not cut off consideration of a defense to the action.").

[28] (Doc. 1-3)

explain why the lack of a formality—a notarial seal (no one contests the validity of the signature) or recordation (recordation is a matter affecting a third party not a signatory)—voids an agreement between the parties despite full or partial performance by the parties.

Additionally, the bankruptcy judge rejected the argument that laches[29] bars an unconscionability claim and found (1) that "the Lessors have not proven that they have been prejudiced by the delay or that there has been a change in conditions that has prevented them from fully arguing their case" and (2) that the Partnership's paying the annual rent under the lease "excuses any delay in the Association's assertion of the unconscionability defense."  In their appeal, the appellants argue that "allowing the Association to resurrect an unconscionability defense to the Lease after literally decades of operating in accord[] with its terms . . . is both inequitable and unjust."  In fact, despite knowing the terms of the Lease, despite litigating the terms of the Lease for decades, and despite repeatedly ratifying and affirming the Lease, the Association failed to raise unconscionability until 2008, when the Association was <u>first</u> required to pay money for the amenities (requiring someone to pay money is not <u>per</u> <u>se</u> unconscionable).  The Partnership's paying the annual rent for more than two decades provides no excuse for the Association's failing to raise the issue of unconscionability until 2008.  Rather, the Association's accepting for two decades (despite successive lawsuits and successive ratifications and affirmations of the Lease) both the benefit of

---

[29] <u>Miami-Dade County v. Fernandez</u>, 905 So. 2d 213, 216 (Fla. 3d DCA 2005) (finding that "'[l]aches is an omission to assert a right for an unreasonable [ ] length of time, under circumstances prejudicial to the adverse party.'") (quoting <u>Ticktin v. Kearin</u>, 807 So.2d 659, 663 (Fla. 3d DCA 2001)).

the Lease and the benefit of the Partnership's paying the annual rent  shows a

prejudicial failure to assert a right for an unreasonable time.

Finally, the bankruptcy judge rejected the argument that the Association either

waived or released unconscionability.  In reaching this conclusion, the bankruptcy judge

found (1) that the 1986 release and the "circumstances under which it was entered"

show "that the parties did not intend for the 1986 release to release the Association's

defense of unconscionability"; (2) that "the Association was only releasing [the

appellants] as to those specific issues raised by the ineffective 1981 Amendment and

the 1983 Lawsuit"; (3) that the 1986 release "was not a waiver or release by the

Association because the Association was not truly independently operated until the

Association's management company was changed in May 2007"; and (4) that the 1990

re-instatement agreement "was not a waiver of any unconscionability defenses by the

Association because it resolved technical issues that were concluded without raising or

dealing with the unconscionability argument."

However, the bankruptcy judge's extremely narrow interpretation of the 1986

release contrasts markedly with the very broad language of the release (quoted above),

which discharges all claims "of whatever kind or nature . . . whether accruing now or in

the future . . . whether known or unknown . . . in any way directly or indirectly arising out

of the Litigation."  The 1986 release demonstrates an intent to release all claims and not

merely the parties' specific claims as to the 1981 amendment.  As the appellants argue

(1) the Association knew of the unconscionability defense as early as 1980, when the

Association's lawyer raised the issue; (2) in "at least two lawsuits between the

Association and the Lessors . . . the Association failed to properly raise the defense or claim of unconscionability in a pleading"; (3) the parties in the 1986 release agreed "that [each party's] relationship with the other, with regard to the Colony Beach Tennis Club Recreational Facilities and the Recreation Lease, shall be governed by the Recreation Lease as originally established and as interpreted in the Agreement"; and (4) the 1990 re-instatement agreement affirms the Association's obligation under the lease.

Although the bankruptcy judge determines that the Association was both administratively dissolved for nearly a decade and "not truly independent" until 2007, the bankruptcy judge fails to explain how these facts render ineffective every resolution and every affirmation of the Lease.  Furthermore, the bankruptcy judge provides little, if any, analysis of the 1980 letter from the Association's counsel, which letter first asserts unconscionability.  In fact, the record demonstrates that the Association knew in 1980 of the unconscionability defense, raised the issue in 1980, failed to assert the defense during more than a decade of litigation, and accepted the benefit of the Lease, each settlement agreement, and each re-affirmation until removing this action to bankruptcy court 2008.  The bankruptcy judge's rejection of both waiver and release is erroneous.

Conclusion

Accordingly, the judgment of the bankruptcy court and each order of the bankruptcy court in this action that is inconsistent with this order are **REVERSED**.  The district court (1) **STAYS** this order pending further order of the district court, retains jurisdiction of the proceeding, and withholds the issuance of instructions to the bankruptcy court; (2) directs that the parties submit by **August 5, 2011**, a paper (only

one paper for each side and only one paper for both this appeal and the companion

appeal in Case No. 8:09-cv-2560-T-23) of **seven (7) or fewer** pages that discusses

the precise form of the remedy that the respective party recommends as a consequence

of the district court's reversal of the bankruptcy court; and (3) sets a hearing for

**August 11, 2011, at 1:30 p.m.** to hear argument on the form of the remedy.  Counsel

for each party shall appear at the hearing prepared and authorized to address the

prospect of court-ordered mediation (including the issues of when, where, and by whom

the mediation will be conducted).

ORDERED in Tampa, Florida, on July 27, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE